UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

CENTER FOR BIOLOGICAL
DIVERSITY and IDAHO
CONSERVATION LEAGUE,

      Plaintiffs,

v.

UNITED STATES FISH AND
WILDLIFE SERVICE and THE ARMY
CORPS OF ENGINEERS,

      Defendants.

Case No. 1:25-cv-00710-DCN

**MEMORANDUM DECISION
AND ORDER**

## I. INTRODUCTION

Before the Court is the Center for Biological Diversity and Idaho Conservation League's ("Plaintiffs") Motion for Preliminary Injunction/Temporary Restraining Order. Dkt. 16. Plaintiffs argue a real estate developer's violation of its Clean Water Act permit triggered statutory obligations which Defendants—the United States Fish and Wildlife Service and Army Corps of Engineers—have not fulfilled. Plaintiffs ask the Court to order Defendants to fulfil those obligations, and to enjoin construction until they do so. Because the Court finds Plaintiffs have not shown irreparable harm or a significant question on the merits, the Court DENIES the Motion.

## II. BACKGROUND

The Idaho Club Lakeside Marina Development Project ("Project") is a real estate redevelopment project on the shores of Lake Pend Orielle. The Project's developer[1] seeks to replace a campground, RV park, and dilapidated marina with a residential community and new commercial marina. To comply with the requirements of the Clean Water Act, the developer sought a Clean Water Act § 404 permit from the Army Corps of Engineers ("Corps"). In addition to the standard Clean Water Act analysis, the permit application triggered the Corps' statutory duties under the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA").

### 1. ESA and NEPA Procedures

Understanding the facts of this case requires a dive into the jargon-and-acronym-laden laws which provide our statutory backdrop. The ESA requires the Corps to ensure that granting the permit would not be "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species . . . ." 16 U.S.C. § 1536(a)(2). ESA review usually begins when the action agency (here, the Corps) develops a Biological Assessment ("BA") pursuant to 50 C.F.R. § 402.12. If the BA indicates the project is not likely to adversely affect any listed species (or any critical habitat of a listed species), the action agency initiates "informal consultation" with the United States Fish and Wildlife Service ("FWS").[2] 50 C.F.R. § 402.14(b)(1).

---

[1] William Haberman, Valiant Idaho, LLC, and Valiant Idaho, LLC II.

If FWS concurs in the action agency's "not likely to adversely affect" conclusion, action agency can move forward. 50 C.F.R. § 402.13. If either the BA or FWS conclude the project is likely to adversely affect a listed species or its critical habitat, the action agency must initiate formal consultation. 50 C.F.R. § 402.13(a). If, however, the action agency and FWS later agree the project is not likely to adversely affect a listed species or its critical habitat, the consultation is terminated. 50 C.F.R. § 402.14(m)(3). The action agency is required to reinitiate consultation, *inter alia*,

> If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; [or] [i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence.

50 C.F.R. § 402.16(a)(2–3). Practitioners refer to these responsibilities collectively as "Section 7" obligations.

NEPA, meanwhile, requires the Corps to assess the environmental effects proposed "major Federal actions," including Clean Water Act permits. 42 U.S.C. § 4332(C); 33 C.F.R. Part 333. In the permitting context, the Corps distinguishes between two levels of review. Typically, the Corps begins its NEPA analysis with an Environmental Assessment ("EA"). 33 C.F.R. § 333.15. An EA alone usually satisfies the Corps' NEPA obligations. 33 C.F.R. § 333.15(c).[3] If the EA concludes the project is unlikely to have a significant

---

[2] If the BA indicates the project may impact a listed marine species, the action agency must advise the United States Marine Fisheries Service. 50 C.F.R. § 402.1(b). But for freshwater and terrestrial species—the only species implicated here—the action agency is only required to consult with FWS. *Id.*

[3] If the major Federal action will obviously have a significant environmental impact, 33 C.F.R. § 333.12(a)(4)(ii), or if the EA reveals that a significant impact is likely, 33 C.F.R. § 333.15(b)(iv), the Corps develops a more comprehensive Environmental Impact Statement ("EIS"). *Cf.* 33 C.F.R. § 333.21.

impact, the Corps issues a Finding of No Significant Impact ("FONSI"). 33 C.F.R. § 333.16. Although NEPA sometimes requires supplemental analyses while major Federal action is ongoing, *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 370–71 (1989), once the major Federal action is completed, NEPA obligations terminate, *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 72–73 (2004).

### 2. Fact Background

When the Corps received the developer's permit application for the Project, it initiated ESA and NEPA review. Under the ESA, the Corps' initial BA concluded the Project was likely to adversely affect bull trout, a listed salmonid species in Lake Pend Orielle and its surrounding waterways. Dkt. 16-2. Critically for the present case, some of the Corps' concerns related to bull trout's presence in a manmade seasonal channel running through the marina construction site: the North Branch of Trestle Creek ("NBTC"). Dkt. 16-2, at 10. The permit application called for rerouting the NBTC from its existing channel to a new path rejoining Trestle Creek. As the BA acknowledged, rerouting activities were to "be completed prior to the marina construction and during dry conditions in the NNTC between August and November." *Id.* But, "[i]f the diversion work cannot be completed during those months, work may be performed during low flow month in the winter when fish activity is minimal." *Id.*

The Corps noted several ways the Project would affect bull trout. Under the permit application as drafted, the Corps anticipated the rerouting of the NBTC would require substantial fish handling and electrofishing to ensure no bull trout remained in the NBTC when it was drained. Dkt. 16-2, at 36–37. The Corps found that fish handling would likely

MEMORANDUM DECISION AND ORDER - 4

adversely affect bull trout. Dkt. 16-2, at 37. In-water pile-driving was also found likely to adversely affect bull trout because it would cause unacceptable levels of noise, which could injure or desensitize the fish. Dkt. 16-2, at 39–42. The Corps found that dry land pile driving might also cause noise but was not likely to adversely affect bull trout. Dkt. 16-2, at 42.

Although fish handling and in-water pile driving were the only effects the Corps concluded were likely to harm bull trout, *see generally* Dkt. 16-2, the Corps assessed several other risks. The Corps determined that excavation and fill activities might, but were unlikely to, adversely impact bull trout. Dkt. 16-2, at 43–44. Among the fill activities considered was the installation of riprap, an erosion barrier made of loose stone. *Id.* Although there was some risk of sedimentation during the removal of a beaver dam at the mouth of the NBTC, that risk did not change the Corps' overall conclusion that the risk of sedimentation was not likely to adversely impact bull trout, and excavation and fill activities were supposed to begin after the NBTC was rerouted. Dkt. 16-2, at 43–44. While the marina's development would result in a relatively warm, dark shoreline favored by predators, the dilapidated marina already created favorable conditions for predators. Dkt. 16-2, at 48. And because the NBTC reroute would channel bull trout away from the marina and to the less-predator-friendly mouth of Trestle Creek, the Corps concluded that the Project was a net positive with respect to bull trout predation risks. Dkt. 16-2, at 49.

Ultimately, the Corps found the Project likely to adversely affect bull trout and requested formal consultation with FWS. Dkt. 16-3. The developer met with FWS on March 19, 2025, to discuss the Project. Following that meeting, the developer submitted

**MEMORANDUM DECISION AND ORDER - 5**

Biological Assessment Addendum I to answer questions and memorialize commitments addressing FWS's concerns. Dkt. 16-4, at 3. In that Addendum, the developer made "firm commitments" to conduct only vibratory pile driving during in-water pile driving and avoid any channel work in the NBTC until active flow ceased to avoid any need for fish handling. Dkt. 16-4, at 6. Based on those commitments, the developer proposed changing the effects determinations from "likely to adversely affect" to "may, but not likely to adversely affect" bull trout. Dkt. 16-5, at 4–5.

The FWS issued its findings in a Letter of Concurrence ("LOC") on July 30, 2025. Dkt. 16-6, at 13. FWS reviewed the Corps' conclusions, as modified by the Addenda, and concluded that the Project may, but was not likely to, affect bull trout. *Id.* In particular, the LOC noted that risks to bull trout would be minimized by the developer's commitments to conduct pile driving in the dry as much as possible, use only vibratory pile driving in-water where necessary, and the seasonal unlikelihood of a substantial bull trout population. Dkt. 16-6, at 5. It further found that risks of stranding would be minimized by the annual drawdown of the Lake, the seasonal disconnection of the NBTC, and the fact that construction activities would occur after the NBTC was rerouted. Dkt. 16-6, at 8. And although the NBTC is a migratory route for juvenile bull trout, the migration season is in the Spring, and the NBTC emptied into the Lake through an elevated culvert. *Id.* In theory, some trout could get caught behind the beaver dam, but by the time disconnection occurred, the pools would be shallow and warm enough that bull trout would be unlikely to remain in the beaver pond for long enough to be stranded. Thus, FWS concluded the risks of stranding were "discountable." Dkt. 16-6, at 8.

**MEMORANDUM DECISION AND ORDER - 6**

FWS further found that risks of increased predation were mitigated by the rerouting of the NBTC and the existing unfavorable conditions for bull trout, Dkt. 16-6, at 7–8, and that long-term sedimentation risks were mitigated by erosion protection, dredging the marina to a uniform depth, and implementation of a no-wake zone, Dkt. 16-6, at 6. Because FWS ultimately concurred in the Corps' "may, but not likely to adversely affect" determination, Section 7 consultation terminated. Dkt. 16-6, at 13.

After the Corps completed its Section 7 responsibilities, it developed an EA as required by NEPA. Dkt. 16-9. Concerns regarding bull trout were raised by public commenters and addressed mostly with reference to the ESA Section 7 consultation and FWS's LOC. Dkt. 16-9, at 9–10. The Corps discussed ESA compliance again at section 10.1 of the EA. Dkt. 16-9, at 47–49. Based on the Section 7 consultation and several other factors, the Corps determined granting the permit would have no significant impact on the environment. Dkt. 16-9, at 58.

Once its ESA and NEPA responsibilities were complete, the Corps issued a Permit authorizing the Project. Dkt. 23-1. Among the many conditions listed in the Permit was a Special Condition which incorporated the BA's assumption that construction activities would occur in a set sequence: first, the new channel of the NBTC would be dug; second, after conditions were already dry, the NBTC would be rerouted; and third, all other construction activities would proceed. Dkt. 23-1, at 4–5.

Fall 2025 was exceedingly wet in and around Lake Pend Orielle. Dkt. 23-3, at 12. On November 24, 2025, the developer reached out to the Corps, stating the new channel had been dug but could not be connected because the NBTC had begun to flow out of

season. *Id.* The developer asked whether it could install a pipe to divert the flow from the NBTC's existing channel so reconnection could take place. *Id.* The Corps advised that doing so would require permit modifications and potentially new consultation. *Id.*

On December 7, 2025, Plaintiff Idaho Conservation League's North Idaho Director, Jennifer Ekstrom, observed the Project from Highway 200. Dkt. 16-14, at 2–3. There, she observed rocks and other fill material consistent with riprap installation had been deposited in the dry lakebed. Dkt. 16-14, at 3. On December 10, 2025, Ekstrom observed further construction activity near, but not in, the NBTC. Dkt. 16-14, at 4. She also observed that the NBTC was still flowing. Dkt. 16-14, at 7. Ekstrom photographed her findings, *see generally* Dkt. 16-14, and contacted Corps Environmental Resources Specialist, Garrett Schock. Dkt. 23-3, at 12.

Schock followed up with the developer on December 15, reminding the developer that, until the NBTC reroute was complete, no other construction work was authorized by the Permit. *Id.* The developer agreed to suspend "jurisdictional" construction until NBTC restoration was completed. *Id.* A week later, the Corps issued a Letter of Non-Compliance and stop work order. Dkt. 16-8. The developer responded, acknowledging the order but contending it had not violated its permit because all work completed to that point was "in the dry" and above the Lake Jurisdictional Ordinary High Water Mark. Dkt. 23-3, at 13. Schock visited the Project site on December 30, 2025, where he found riprap on the dry shoreline, straw on the banks (to prevent runoff), and eight steel piles installed "in the dry" atop the banks of the Lake. *Id.*

MEMORANDUM DECISION AND ORDER - 8

Work halted until January 28, 2026, when Schock determined that the NBTC had no active flow. Dkt. 23-3, at 17–23.[4] The reroute was completed the same day, and Schock verified compliance on February 3, 2026. Dkt. 23-3, at 23. As of the date Plaintiffs' Motion was heard—March 17, 2026—the developer is back in compliance with the Permit.

Plaintiffs filed suit on December 18, 2025, eight days after they identified the developer's permit violation. Dkt. 1. On February 17, 2026, they filed the operative Amended Complaint. Dkt. 12. They filed the instant Motion on February 23, 2026, 78 days after they first observed permit violations and 26 days after the developer completed the NBTC reroute. Plaintiffs allege the developer's violation of the permit may have endangered bull trout in unanticipated ways, requiring Defendants to reinitiate Section 7 consultation and to issue a supplemental EA. In the meantime, Plaintiffs argue, construction must be enjoined. *See generally* Dkt. 16-1.

Defendants argue Plaintiffs are not entitled to a preliminary injunction because the agencies' investigation found no evidence the out-of-sequence construction impacted bull trout or their habitat—let alone any ongoing impact—precluding Plaintiffs from showing irreparable harm. Defendants further argue Plaintiffs are unlikely to succeed on the merits because Defendants fully complied with their Section 7 and NEPA assessment obligations before the permit was issued, and the developer's out-of-sequence construction did not

---

[4] Ekstrom suggests it was unlikely, given weather conditions, that the NBTC was dry on January 28, 2026. However, Ekstrom was not actually present on the property on January 28, and her supposition is directly contradicted by Schock in his declaration. Dkt. 23-3, at 17–23. Reading the Ekstrom and Schock declarations as consistent where possible, it appears that Ekstrom's assumption that it was unlikely the NBTC was dry on January 28, 2026, was incorrect.

MEMORANDUM DECISION AND ORDER - 9

trigger renewed obligations under either statute. *See generally* Dkt. 23. Plaintiffs have replied. Dkt. 24.

In light of the time-sensitive nature of the Motion, the Court expedited briefing, Dkt. 22, and held a hearing on March 17, 2026. The matter is now ripe for review.

## III. LEGAL STANDARD

### A. Preliminary Injunction

The basic function of a preliminary injunction is to "preserve the status quo ante litem pending a determination of the action on the merits." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980). "A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Garcia v. Cnty. of Alameda*, 150 F.4th 1224, 1229 (9th Cir. 2025). "A preliminary injunction . . . should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Fraihat v. U.S. Immigration & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021). A party seeking a preliminary injunction must clearly demonstrate: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent injunctive relief; (3) that the balance of hardships tips in plaintiff's favor; and (4) that an injunction serves the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Ninth Circuit applies the *Winter* factors on a sliding scale. A party that cannot show a likelihood of success on the merits may nonetheless obtain injunctive relief "if there are serious questions going to the merits; there is a likelihood of irreparable injury to the plaintiff; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *Villegas Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

**MEMORANDUM DECISION AND ORDER - 10**

However, [u]nder *Winter,* plaintiffs must establish that irreparable harm is *likely,* not just possible, in order to obtain a preliminary injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis original).

### B. APA

Where the APA provides the court's authority to review an agency action (which is true in both the ESA and NEPA context), a plaintiff must show at least a serious question under arbitrary and capricious review to be entitled to a preliminary injunction. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc); *see also* 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if:

> [T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### IV. DISCUSSION

Plaintiffs are not entitled to a preliminary injunction. They have failed to identify any *imminent* (as opposed to past) irreparable harm, or to show they are *likely* to suffer irreparable harm in the absence of an injunction. Moreover, they fail to show a likelihood of success on—or even a significant question as to—the merits. Finally, although the balance of the equities tilts in favor of the interests of bull trout by statute, it is far from clear that an injunction would serve that interest. Because Plaintiffs fail to show a clear entitlement to preliminary relief, the Motion must be DENIED.

MEMORANDUM DECISION AND ORDER - 11

### A. Irreparable Harm

The simplest reason Plaintiffs cannot receive preliminary relief is they fail to show an imminent threat of unlawful harm, or even that they are likely to suffer any harm in the absence of an injunction.

*1. The Court cannot presume harm based solely on a procedural violation.*

Historically, irreparable harm was relatively easy for NEPA and ESA plaintiffs to show. The Ninth Circuit reasoned that procedural violations of NEPA and the ESA led to indeterminate harm; the statutes obligated agencies to investigate environmental risks; thus, indeterminacy itself was an irreparable harm which could not be remedied absent an injunction. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1384 (9th Cir. 1987). In cases like *Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985), *Sierra Club v. Marsh*, and *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006), the Ninth Circuit established a relatively lenient standard for finding irreparable harm—especially in the NEPA and ESA contexts. Plaintiffs relied heavily on this line of reasoning, citing *Thomas*, *Sierra Club v. Marsh*, and their progeny at oral argument and in their reply briefing. *See* Dkt. 24 *passim*.

The Supreme Court, however, rejected that line of reasoning in *Winter.* 555 U.S. at 22. In the case below, the Ninth Circuit found injunctive relief based on a mere possibility of irreparable harm could support an injunction if the plaintiff showed a strong likelihood of success on the merits. *Id.* at 21. The Supreme Court reversed, finding that plaintiffs seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction." *Id.* at 22. The fact that the underlying case was brought under NEPA did

not impact the Court's analysis. *See Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088–89 (9th Cir. 2015).

Following *Winter*, the Ninth Circuit has repudiated the reasoning behind *Thomas* and *Sierra Club v. Marsh* (and explicitly overruled both cases) in *Cottonwood Environmental Law Center v. U.S. Forest Service*. 789 F.3d at 1091. There, the Ninth Circuit described its pre-*Winter* test:

> Starting with *Thomas v. Peterson,* 753 F.2d 754, 764 (9th Cir.1985), we have long recognized an exception to the traditional test for injunctive relief when addressing procedural violations under the ESA. *See also Wash. Toxics,* 413 F.3d at 1035; *Sierra Club v. Marsh,* 816 F.2d 1376, 1384 (9th Cir.1987). In *Thomas,* after holding that plaintiffs established a procedural violation of the ESA, we addressed the appropriate remedy. We looked to our case law under NEPA, noting that "[t]he procedural requirements of the ESA are analogous to those of NEPA . . . ." 753 F.2d at 764. We then acknowledged in the NEPA context, we had held that because "[i]rreparable damage is presumed to flow from a failure properly to evaluate" environmental impacts of an agency action, an injunction is typically the appropriate remedy for a Section 7 violation. *Id.* (citing *Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1250 (9th Cir.1984); *Friends of the Earth, Inc. v. Coleman,* 518 F.2d 323, 330 (9th Cir.1975)). Critical to our discussion here was our holding that "[w]e see no reason that the same principle should not apply to procedural violations of the ESA." *Id.* In so holding, we explained that "[i]t is not the responsibility of the plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed." *Id.* at 765.

*Cottonwood*, 789 F.3d at 1088–89.

The Ninth Circuit went on to assess the impact of *Winter*. First, the Circuit acknowledged the ESA strips courts of some of their equitable discretion by conclusively determining that harms to endangered species are irreparable and the public interest favors their preservation. *Cottonwood*, 789 F.3d at 1090 (citing *TVA v. Hill*, 437 U.S. 153, 185–88 (1978)). But "nothing in the ESA [] explicitly, 'or by a necessary and inescapable

inference,' restricts a court's discretion to decide whether a plaintiff has suffered irreparable injury." *Cottonwood*, 789 F.3d at 1090 (*citing Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987). What's more, "even though *Winter* and *Monsanto* address NEPA, not the ESA, they nonetheless undermine the theoretical foundation for our prior rulings on injunctive relief in *Thomas* and its progeny. Indeed, *Thomas*'s reasoning explicitly relied on the presumption of irreparable injury that we had previously recognized in the NEPA context." *Id.*

> Thus, the Ninth Circuit held

> there is no presumption of irreparable injury where there has been a procedural violation in ESA cases. A plaintiff must show irreparable injury to justify injunctive relief. In light of the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them, establishing irreparable injury should not be an onerous task for plaintiffs.

*Id.* at 1091; *see also Friends of the Clearwater v. Higgins*, 472 F. Supp. 3d 859, 866–67 (D. Idaho 2020), *aff'd*, 847 F. App'x 394 (9th Cir. 2021). Thus, ". . . *Thomas*'s ruling on injunctive relief is no longer good law . . . ." *Cottonwood*, 789 F.3d at 1092. In place of *Thomas*'s presumption of irreparable harm, the Ninth Circuit left it to the district court to determine, based on the plaintiff's evidence of harm to the environment, whether an endangered species would suffer irreparable harm. *Id.* at 1091.

### 2. Plaintiffs have not shown irreparable harm is likely.

The only identifiable effects from the developer's violation in this case were the installation of piles and riprap in the dry and (possibly) incidental sedimentation caused by work in the marina basin. The risks created by the former two effects were already

considered by the Corps and FWS during the initial Section 7 consultation, and both were found unlikely to harm bull trout in and of themselves. *See* Dkt. 16-2, at 42–44; Dkt. 16-6, at 5–6. Thus, the only concrete harm to bull trout of which Plaintiffs have any evidence is the possibility that the developer's work installing piles and riprap disturbed sediment between the mouth of the NBTC and the low water line, which the NBTC then swept into Lake Pend Orielle.

But there is insufficient evidence to conclude increased sedimentation occurred at all, let alone had any impact on bull trout. While Plaintiffs present evidence showing construction occurred while the NBTC was flowing into the lake, they present scant evidence that construction machinery crossed, entered, or otherwise disturbed the NBTC between its usual outlet and the low water line. In briefing and at the hearing, Plaintiffs relied on the Ekstrom declaration and attached photographs, which show riprap installed on banks with water below. Dkt. 16-14, at 4–6.

However, the declaration and memoranda of record drafted by Garrett Schock (the Corps engineer who drafted the Permit and investigated the Permit violations) suggest that riprap installation had little to no effect on the NBTC. On December 30, 2025 (twenty days after Ekstrom observed the Project), Schock observed, "No recent work was evident within the NBTC itself. Silt curtains had been installed on both sides of the NBTC to prevent sediment from entering the stream." Dkt. 23-4, at 1. Schock went on to note, "Silt curtains were observed along both sides of the bank at the confluence of the NBTC and the lake," and, "The areas with riprap placement appeared to be at least 10 feet from the water's edge." Dkt. 23-4, at 1–2.

**MEMORANDUM DECISION AND ORDER - 15**

The presence of silt screens at the confluence of the NBTC and Lake make it less likely that heavy machinery crossed the stream between its usual outflow and the Lake or knocked sediment into the NBTC. Schock found no evidence that work had occurred in the NBTC's channel. And Schock verified that riprap placement occurred "in the dry." Dkt. 23-3, at 14. In all, these activities minimized sedimentation in ways explicitly contemplated by FWS. *See* Dkt. 16-6, at 6 (explaining the use of sediment traps, fences, weed free mulch, and specified vehicle paths would minimize sediment transfer from disturbed uplands and nearshore areas to open water).

To the extent the Ekstrom and Schock declarations differ, there are good reasons to prefer Schock's findings. Ekstrom made her observations from a nearby parcel rather than the property itself, leaving her with a limited ability to observe how close the riprap was to the waterline. The limitations of Ekstrom's vantage point are evident in her declared statement that a beaver dam had been removed. Ekstrom was unable to see a beaver dam from her vantage and believed the developer removed the dam. Dkt. 16-14, at 5. Pictures taken by Schock show the beaver dam remained in place as late as December 30. Dkt. 23-3, at 17. Although Ekstrom saw the site earlier, Schock saw the site in much greater detail. Accordingly, the Court credits Schock's findings as accurate as of December 30.

The Court does not mean to say it is impossible that the developer's activities caused increased sedimentation. But Plaintiffs ask the Court to infer from the simple fact of development that the development must have increased sediment in the water column. Considering Schock's more detailed investigation relative to Ekstrom's, and the fact that Schock's findings counsel against concluding that sedimentation *must* have occurred, the

**MEMORANDUM DECISION AND ORDER - 16**

Court declines to draw the inference Plaintiffs request. The Court finds insufficient evidence to conclude that unanticipated sedimentation occurred here.[5]

Even if sedimentation did occur—and even if it did impact some bull trout at some point—there is no evidence of any current harm to bull trout caused by sedimentation which an injunction could mitigate or rectify. Any sedimentation caused by construction activities prior to the Corps' stop work order would have settled by now. The former channel of the NBTC is now dry. Any harms caused by sedimentation are purely in the past. A party cannot show irreparable harm entitling it to an injunction based on purely past harms which have no possibility of recurrence. "'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). Because any harm from sedimentation (and any incidental harm from driving piles and installing riprap in the dry) would have already been incurred, will not recur, and could not be redressed by an injunction, they cannot form irreparable harm.

Plaintiffs offer two other theories of irreparable harm. First, they argue the Corps and FWS implicitly found the Project likely to adversely affect bull trout under these circumstances. They reason the BA initially found the Project likely to adversely affect bull trout, the Project committed to a particular sequence of activities to change that finding,

---

[5] For the same reasons the Court finds insufficient evidence to conclude sedimentation itself *occurred*— and because FWS concluded bull trout were unlikely to be present during construction activities anyway due to unfavorable temperature and depth, *see* Dkt. 16-6, at 7—the Court finds insufficient evidence to conclude that the harms from increased sedimentation are *likely*. *See Cottrell*, 632 F.3d at 1131 (to be entitled to an injunction, Plaintiff must show that irreparable harm is likely, not merely possible).

and the sequence is being violated; thus, by the Corps' own findings, the Project should once again be considered "likely to adversely affect" bull trout. *See* Dkt. 16-1, at 21–22. But the Plaintiffs misconstrue the record. The Corps initially found the Project likely to adversely affect bull trout based on fish handling/electrofishing and in-water impact pile driving. *See* Dkt. 16-2, at 37, 39–42.  Although the fish handling finding changed based on a firm commitment to reroute the NBTC after it naturally disconnected from the Lake, *that* sequence was never violated. Dkt. 23-3, at 23. Nor is there any evidence that in-water impact pile driving has occurred. Thus, the simple fact that work occurred out of sequence does not resurrect the "likely to adversely affect" finding.[6]

Finally, Plaintiffs point to their expert, Charles Corsi, who suggests that "[r]erouting the [NBTC] even during low-flow or partial-freeze conditions would require implementation of appropriate mitigation measures . . . . Despite full and proper mitigation, rerouting the creek while flow is present may still result in fish mortality." Dkt. 16-15, at 9. But again, the NBTC reroute is already complete, so any harm incurred during the reroute is entirely historical with no possibility of recurrence. And given Schock's declaration, it is unlikely that Corsi's anticipated harms came to pass at all. Dkt. 23-3, at 18.

---

[6] The Court rejects Plaintiffs arguments for irreparable harm based on the BA for other reasons, too. As explained above, the Court rejects the present tense framing: wrongful activities *occurred*; there is no evidence wrongful activities are presently *occurring*. The Court also rejects Plaintiffs' treatment of the environmental effects of the violation as unknowable in principle absent further consultation. The Corps and FWS already explicitly considered the effects of pile driving and riprap installation in the dry and found neither likely to adversely affect bull trout, *see* Dkt. 16-2, at 42–44; Dkt. 16-6, at 5–6, and the unexplored risks from sedimentation are discussed in detail above.

As for other long-term harms stemming from the Project identified by Corsi, the agencies have already considered and rejected those harms. The agencies acted within the scope of their expertise based on a comprehensive review of the literature and record, and substantial evidence supports their conclusion that long-term risks associated with the Project are discountable. Accordingly, the Court defers to the agencies' findings and concludes the Project's long-term harms are discountable. *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067–68 (9th Cir. 2018).

Because Plaintiffs have not shown irreparable harm, the Motion must be DENIED.

**B.  Likelihood of Success on the Merits**

The Court further finds that Plaintiffs have failed to show a significant question on the merits, which also requires denying the Motion.

*1. ESA Section 7*

Reinitiation of Section 7 consultation is governed by 50 C.F.R. § 402.16. The parties focus on subsections (a)(2) and (3), which require reinitiation "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;" or "[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence." The Corps' conclusion that it is not required to reinitiate Section 7 consultation is subject to arbitrary and capricious review. *See Friends of the Clearwater v. U.S. Forest Serv.*, 2021 WL 3408595, at *5–6 (D. Idaho Aug. 4, 2021).

Plaintiffs point out that the Permit, the BA, and the LOC all concluded the Project was not likely to adversely impact bull trout based, in part, on the promise that construction activities would happen in a particular sequence. Now that some construction occurred out of sequence, Plaintiffs allege the Permit, BA, and LOC are no longer useful, and a new round of consultation must occur to determine the Project's impact given the out-of-sequence activities which have occurred so far. Defendants counter the environmental *effects* of construction during NBTC flow were fully considered in the BA, including the effects of the identified violations specifically. Dkt. 23, at 20–22.

For many of the same reasons the Court finds that harms from the Permit violation are speculative, the Court finds the Corps did not act arbitrarily or capriciously in concluding it had already assessed the possible effects of the Permit violation. There was no new information or Project modification suggesting bull trout might be affected *in a manner or to an extent not previously considered*. The effects of installation of piles and riprap in the dry were extensively considered in the BA and LOC. Dkt. 16-2, at 42–44; Dkt. 16-6, at 5–6. The agencies also considered the effects of incidental sedimentation caused by pile and riprap installation—including the effects which would occur in the absence of mitigation—even if the effects were not considered in the specific context of the out-of-sequence construction. 16-2, at 42–44; Dkt. 16-6, at 6. Thus, the Court finds the BA and LOC fully considered the extent of increased sedimentation from construction activities and Defendants were not required to reinitiate consultation under 50 C.F.R. § 402.16(a)(2).[7]

---

[7] While the Court finds the BA and LOC sufficiently considered the risks of sedimentation with or without mitigation measures, the Court's conclusion is further supported by the developer's use of silt screens, the

*2. NEPA Supplemental EA*

Plaintiffs also argue Defendants were obligated to abide by NEPA which imposes an obligation to supplement an environmental assessment when: (1) a major Federal action is ongoing, *see SUWA*, 542 U.S. at 72–73,  and either (2) a permittee "makes substantial changes to the proposed action" or "there are substantial significant new circumstances or information" bearing on a project's environmental impact, *see* 33 C.F.R. § 333.34.

Defendants argue there is no ongoing major Federal action in this case because the Corps issued the Permit, and once the Permit was issued, the major Federal action ended. They cite *Cold Mountain v. Garber*, where the Ninth Circuit held that no federal action remained where a special use permit's provisions were violated because the federal action terminated on issuance of the permit. 375 F.3d 884, 894 (9th Cir. 2004), *as amended* (Aug. 9, 2004).

Although it appears the issue is open, the Court finds the weight of circuit authority supports Defendants' argument that NEPA obligations terminate once a Clean Water Act permit is issued. Courts considering whether an ongoing major Federal action has terminated look to several factors:[8] whether the agency is taking the action itself or is

---

absence of evidence of construction in the NBTC channel, and the Corps' verification that pile and riprap installation occurred in the dry. *See* Section IV.A.2, *surpra*. Such mitigation activities minimize the possibility that the Permit violation resulted in unanticipated risks.

[8] *See Protect Lake Pleasant, LLC v. Connor*, 2010 WL 5638735, at *21 n.20 (D. Ariz. July 30, 2010) ("Courts have taken a somewhat nuanced approach to the issue of whether a federal action remains to occur, as can be seen. Further, the resolution of that issue also is highly fact-intensive.").

**MEMORANDUM DECISION AND ORDER - 21**

merely approving another's action;[9] whether the agency's discretion includes the ability to weigh the benefits of the project against the detrimental effects of the project;[10] and whether the agency's discretion is largely or entirely confined to enforcement procedures.[11]

Here, those factors indicate there is no ongoing major Federal action. The Corps' involvement was limited to the standard CWA approval process. Plaintiffs have not identified any cases where an agency was held to ongoing major Federal action responsibilities based on permitting authority alone, whereas the Court can identify several courts that determined the issuance of a permit terminates NEPA obligations.[12] Courts have found ongoing major Federal actions where the agency administered the action, *see Marsh*, 490 U.S. at 372, and where an initial approval was subject to additional approvals after initial approval, *Bosworth*, 465 F. Supp. 2d at 939. But neither party has identified a case where an ongoing major Federal action was found based solely on the fact an agency previously issued a permit, and the permitted action is ongoing.

The nature of the Corps' post-issuance authority supports the conclusion that NEPA obligations terminate at permit issuance. Once the Corps issues a permit, the nature of the Corps' responsibilities typically changes from determining what is best for the environment

---

[9] *Compare Marsh*, 490 U.S. at 371–73 *with SUWA*, 542 U.S. at 72–73; *see also Cold Mountain*, 375 F.3d at 894; *Sierra Club v. Bosworth*, 465 F. Supp. 2d 931, 938–39 (N.D. Cal. 2006).

[10] *Marsh*, 490 U.S. at 372.

[11] *W. Watersheds Project v. Bureau of Land Mgmt.*, 971 F. Supp. 2d 957, 977 (E.D. Cal. 2013); 42 U.S.C. § 4336(10)(v).

[12] *See, e.g.*, *Cold Mountain*, 375 F.3d at 894; *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1095 (9th Cir. 2013); *W. Watersheds Project*, 971 F. Supp. 2d at 977; *Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs*, 841 F. Supp. 2d 968, 970–71 (S.D.W. Va. 2012).

in a broad sense to determining how best to exact compliance with the permit's conditions. Although the Corps can modify permits, *see* 33 C.F.R. § 325.7, unilateral permit modifications are rare, and at least one court has found that theoretical authority irrelevant. *See Ohio Valley*, 841 F. Supp. 2d at 970–71 (finding that a § 404 permit ceases to be a major Federal action on issuance). Multiple courts have explicitly or implicitly held ongoing authority to exact compliance is irrelevant. *Cold Mountain*, 375 F.3d at 894; *W. Watersheds Project*, 971 F. Supp. 2d at 977. Thus, the Court finds that the Corps' NEPA obligations terminated on issuance of the Permit.

   3.   *FWS LOC*

Finally, Plaintiffs argue FWS acted arbitrarily and capriciously by concurring with the Corps that the Project was not likely to adversely affect bull trout. They argue FWS failed to consider the marina's impact on predator habitat, increased sedimentation in the water column, and the developer's removal of beaver dams. Dkt. 16-1, at 17–20. They support their argument with references to their expert, Charles Corsi, who opined it was unreasonable for FWS to concur without investigating the issues more thoroughly. *See generally* Dkt. 16-15. Defendants argue they sufficiently considered each concern.

An agency action is arbitrary or capricious if the agency relied on improper factors, did not consider an important aspect of the problem, reached a decision contrary to the weight of evidence in the record, or reached a manifestly implausible conclusion. *See Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43. On arbitrary and capricious review, the Court must confine its review to the administrative record except: (1) to show the agency failed to consider a relevant factor, (2) when the agency relied on documents not in

the record, (3) as necessary to explain otherwise impenetrable subjects, or (4) when the plaintiffs show the agency acted in bad faith. *Lands Council v. Powell*, 395 F.3d 1019, 1030–31 (9th Cir. 2005). With respect to the first *Lands Council* exception, "reviewing courts may not look to this evidence as a basis for questioning the agency's scientific analyses or conclusions." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014). And although the ESA requires FWS to consider the best available scientific data, a plaintiff cannot show it failed to do so unless it points to data FWS failed to consider. *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080–81 (9th Cir. 2006).

Regarding the Project's effects on predator habitat, the LOC acknowledges the increased risk of predators (especially from bass), but found the environment around the marina would be too warm and still to attract many bull trout; thus, the risk of predation was acceptable. Dkt. 23, at 25; Dkt. 16-6, at 7–8. Plaintiffs suggest this is insufficient because FWS "ignored" the marina's capacity to sustain predators other than bass (including pike and walleye) and concluded bull trout would stay away from the marina based on seasonal factors (temperature and noise) which might not always hold. Dkt. 16-1, at 17–18 (citing Dkt. 16-15, at 7).

Plaintiffs do not identify any evidence in the record which FWS failed to consider, so the agency did not act against the weight of evidence here. Nor was FWS's conclusion manifestly implausible: the agency weighed the record and expert opinions and reached its conclusion based on record-supported findings which reduced risks of increased

**MEMORANDUM DECISION AND ORDER - 24**

predation.[13] Plaintiffs (and Corsi) argue the agency's predation studies were out of date, but this objection is doomed by their failure to identify any newer, better studies. *Locke*, 776 F.3d at 995 ("The [best scientific data] standard does not, however, require an agency to conduct new tests or make decisions on data that does not yet exist."). The agency did not fail to consider the issue of increased predation risk; it simply found the Project's impacts on those risks were not likely to adversely affect bull trout. FWS was not arbitrary or capricious with respect to its predation findings.

Plaintiffs next argue FWS arbitrarily and capriciously ignored sedimentation risk to bull trout swimming through the main channel of Trestle Creek when the developer first connected the new channel of the NBTC to Trestle Creek. FWS recognized that sedimentation carried risks to bull trout swimming through the NBTC during rewatering, and required the developer to exclude bull trout until rewatering was complete. Dkt. 16-1, at 18–19. However, FWS's finding of risk was dependent on the character of the new channel: a newly constructed, dry waterway. The risks of sedimentation created by the disturbed soil in the new channel are far greater than the risks of sedimentation created by the simple removal of a plug after the sedimentation from the new channel has settled.

---

[13] I.e., that bull trout were unlikely to favor the marina, that the NBTC reroute would reduce the number of juvenile bull trout swept into the marina, and both the NBTC reroute and light transmissive decking would improve visibility for bull trout aiding their ability to avoid predators in the first place. Dkt. 16-6, at 7–8. Although Plaintiffs are correct that the LOC only explicitly considered temperature concerns in the context of summer, Dkt. 16-1, at 18; Dkt. 24, at 13, the LOC explicitly incorporated a portion of the BA noting median temperatures in the marina's vicinity from May to October, Dkt. 16-6, at 7 (citing Dkt. 16-2, at 28). The BA noted the Lake's winter drawdown (which would render the marina totally or predominantly dry) typically runs from November to April. Dkt. 16-2, at 13; *see also* Dkt. 16-6, at 2 (incorporating information in the BA by reference). Thus, FWS did not act arbitrarily or capriciously in failing to assess winter temperatures.

FWS's decision was not against the weight of evidence or manifestly implausible. And since FWS considered the risks of sedimentation stemming from reconnection, FWS did not fail to consider the problem at all, either. Thus, FWS did not act arbitrarily or capriciously in declining to order special procedures for connecting the NBTC to Trestle Creek.

Plaintiffs next argue the agency acted arbitrarily and capriciously because it discounted its own evidence that bull trout winter in beaver ponds, and thus failed to assess the dangers of handling stranded fish. Dkt. 16-1, at 19–20. Although an agency may act arbitrarily and capriciously by contradicting itself, FWS did not contradict itself here. FWS admits that evidence in the record suggests adult bull trout "have been observed overwintering in deep beaver . . . ponds or pools containing large woody debris in larger rivers." Dkt. 16-11, at 10. FWS's findings regarding the bever dam here, however, is very different: "Any remaining pools behind the beaver dams . . . would be warm and shallow, making them unsuitable habitat and unlikely to be occupied by bull trout of any age class." Dkt. 16-6, at 8. Moreover, the BA (via Addendum 2) considered the possibility that bull trout might occupy the beaver ponds and concluded it was near zero. Dkt. 16-5, at 3.

FWS considered the possibility that beaver dams might have bull trout in them after NBTC disconnection, and concluded the possibility was sufficiently remote to be discounted, with evidence in the record to sustain that finding. Thus, Plaintiffs have not

MEMORANDUM DECISION AND ORDER - 26

shown that they are likely to demonstrate FWS acted arbitrarily or capriciously with respect to beaver dam-related fish handling risks.[14]

Plaintiffs have not identified any arbitrary or capricious action taken by FWS in issuing the LOC and are, therefore, not likely to succeed on the merits based on their current showing.

<h2 style="text-align:center">V. CONCLUSION</h2>

In determining whether an injunction is appropriate, the Court cannot presume irreparable harm, and Plaintiffs have failed to show irreparable harm here. Two of the harms they identify—pile driving and riprap installation—have already been assessed by expert agencies to have little to no effect on bull trout in this case. It is speculative that the last harm—incidental sedimentation—even occurred. Moreover, any harms identified by Plaintiffs lie entirely in the past and cannot form the basis for a preliminary injunction. Even if the Court found irreparable harm, however, Plaintiffs have failed to show a likelihood of success on the merits. The Motion must, therefore, be DENIED.

---

[14] Plaintiffs make several assertions in this section which do not squarely fit into the Court's analysis, but which the Court will, nonetheless, address. First, Plaintiffs maintain that "Reliance on the 'firm commitment' to reroute NBTC 'in the dry,' does not cure [FWS's failure to consider fish handling harms] because, as explained above, that condition did not occur." Dkt. 16-1, at 19. The record shows that, although some work did take place out of sequence, the rerouting of the NBTC did occur "in the dry." Dkt. 23-3, at 23. The Court is not required to ignore the impact of the developer's "firm commitment" on FWS's analysis. Second, Plaintiffs fault FWS for failing to explain its reasoning for reversing its finding that fish handling was "likely to adversely affect" bull trout from a previous assessment of the site in 2022. Dkt. 16-1, at 19 (citing *FCC v. Fox TV Stations*, 556 U.S. 502, 515 (2009)). However, because of the developer's firm commitment to reroute the NBTC in the dry, the Corps found the need for fish handling was completely obviated. FWS did not need to explain its change of position because its position did not change: fish handling would be likely to adversely affect bull trout if it was necessary; fish handling was no longer necessary, so FWS's prior conclusion was irrelevant. Finally, Plaintiffs cite to Corsi's declaration, which squarely contradicts FWS's findings. Because Plaintiffs do not identify any scientific data FWS ignored on this point, and because FWS is entitled to rely on its own experts, Corsi's declaration is irrelevant on this subject as well.

MEMORANDUM DECISION AND ORDER - 27

## VI. ORDER

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiffs' Motion for Preliminary Injunction/Temporary Restraining Order (Dkt. 16) is DENIED.

DATED: March 24, 2026

David C. Nye
U.S. District Court Judge